817 So.2d 192 (2002)
STATE of Louisiana
v.
Lenard T. HICKS.
No. 01-KA-1064.
Court of Appeal of Louisiana, Fifth Circuit.
April 10, 2002.
*194 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Alison Wallis, Assistant District Attorney, Gretna, LA, for Plaintiff/Appellee.
Frederick Kroenke, Baton Rouge, LA, for Defendant/Appellant.
Panel composed of Judges THOMAS F. DALEY, SUSAN M. CHEHARDY, and CLARENCE E. McMANUS.
DALEY, Judge.
Defendant, Lenard Hicks, appeals his conviction for manslaughter. On appeal, he urges the following assignments of error:
1. The evidence was insufficient to establish the guilt of the defendant, in that, viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt.
2. The trial court erred in imposing a sentence herein that is unconstitutionally excessive.
3. The failure of trail counsel to file a Motion to Reconsider the Sentence should not preclude this Court considering the constitutionality of the sentence; and, in the event that it does, then the failure of trial counsel constitutes ineffective assistance of counsel.
Defendant was charged in a Bill of Information on November 23, 1999 with manslaughter in violation of LSA-R.S. 14:31. He pled not guilty and filed various pretrial motions not pertinent to this appeal. *195 He proceeded to trial on June 28, 2000. After a three day trial, the jury found defendant guilty as charged. Defendant was sentenced to 40 years at hard labor.
Thereafter, the State filed a multiple offender Bill of Information alleging defendant to be a third felony offender, based on a 1995 conviction for possession of stolen property valued over $500.00 and a 1996 conviction for possession of cocaine. A multiple bill hearing was held on November 21, 2000, after which the trial court found defendant a third felony offender. The trial court vacated defendant's original sentence and imposed an enhanced sentence under LSA-R.S. 15:529.1 of life imprisonment without benefit of parole, probation, or suspension of sentence. The trial court also sentenced defendant to an additional one year after holding him in contempt of court on two separate occasions. The one year for the contempt charges was ordered to run consecutively to defendant's manslaughter sentence.
On January 12, 2001, defendant filed a Motion for an Out of Time Appeal, which was granted by the trial court.

FACTS
On Friday, September 17, 1999, Phelis Causey (a/k/a "Champ") and Karonja Taylor (a/k/a "Nakia" and "Nick"), who are members of the rap group Ghetto Survivors, were recording music at Keep Selling Records, a recording studio owned by the victim, George Thompson (a/k/a "Dick").[1] Stanley Toval (a/k/a "Scooby"), the production manager for Keep Selling Records, and Kevin Alfred (a/k/a "Cave"), an engineer for the recording studio, were also present at the studio and were working with Champ and Nick during their scheduled recording session. Later that evening between 7:30 p.m.-8:30 p.m., Wayne Mills (a/k/a "Messiah"), defendant Lenard Hicks (a/k/a "Nardi" and "Crucifix"), and a third person identified only as "Shorty" unexpectedly showed up at the studio to write music, despite the fact they were not scheduled for a recording session.
Dick, the owner/victim, arrived at the studio shortly thereafter and told Messiah and his associates to leave. Dick and Messiah got into an argument at which time defendant, Shorty, Cave, and Nick left the room and went downstairs. Champ, who had headphones on during the argument, remained in the room while Dick and Messiah continued to argue. The testimony showed that Dick and Messiah had an argument several days previously over an answering machine message.
Defendant, Hicks, left the studio and went outside to Messiah's car to retrieve Messiah's gun and hide it, according to his recorded statement that was introduced into evidence. Hicks feared that Messiah would use it to kill Dick. Hicks stated that it was his intent to hide the gun under a nearby abandoned car.
A commotion then began at the bottom of the stairs outside of the second floor recording studio. In particular, Cave attempted to lock the door at the bottom of the stairs to prevent Hicks and Shorty from going back up the stairs to the recording studio because Dick did not want them in the studio. However, Cave was unable to lock the door because Hicks was already at the door trying to push his way back up the stairs. Shorty was trying to calm Hicks down and was also trying to keep him from going back upstairs to the studio. Nick, who was just coming down the stairwell, joined in the effort to prevent Hicks from going back up the stairs. *196 As Nick proceeded down the stairs, he saw Hicks holding a small pistol.
Messiah then exited the recording studio and came down the stairs to the scuffle. According to Nick, Messiah said "hold up, man, hold up" and then went over the top of the crowd into the middle of the commotion and came out with a gun. Messiah ran back up the stairs past Nick and into the studio. Nick called out to Champ, who was still in the studio with Dick, because he believed Champ was in danger.
Champ heard someone screaming his name and took his earphones off. As he was preparing to leave the studio, Messiah came into the room with a gun and put it to Dick's neck. Dick then pulled his gun and put it to Messiah's neck. The two fell into a tussle with each grabbing for the other's gun. Two gunshots went off, at which time Champ crawled out of the room. As Champ was crawling out of the room, he saw Dick, who was standing with his back against the wall, slide to the ground and saw Messiah standing over him.
Champ fell down the stairs and he, Cave, and Nick started walking towards a nearby gas station. As the three crossed the street away from the studio, they heard a third gunshot. Nick then saw Messiah come out of the studio holding a gun in his hand and carrying another gun in his waistband. Messiah got into a sports utility vehicle that pulled up along side of him and left.
Nick and Champ went back to the studio where Nick saw Dick lying under a table in a pool of blood. The two went back to the gas station where they told Cave to call the police. Instead of calling the police, Cave called Scooby, who subsequently came to the gas station.
In the meantime, at approximately 9:00 p.m., a Domino's pizza delivery man arrived at the recording studio to deliver a pizza. It was his second pizza delivery to the studio that night, the first delivery occurring between 6:30 p.m.-7:00 p.m. During his first delivery, the delivery man found the wrought iron fence door at the bottom of the stairs leading up to the recording studio locked. He called the recording studio from his cell phone and some men came down the stairs and he gave them the pizza. On his second delivery, the iron fence door was open. The delivery man proceeded up the stairs and found the door to the studio ajar. He went inside announcing "Domino's pizza." There was no response so he continued to walk further into the studio where he found the victim lying on the floor with a puddle of blood around his head.[2] He ran back to his truck, called the store from his cell phone and asked his store to call the police.
The police arrived at the scene, at which time Nick and Champ left the gas station in a taxi cab while Scooby and Cave went to the recording studio and talked to the police. After discerning from witnesses the others who were present in the studio at the time, the police compiled photographic lineups of Messiah and Hicks and confirmed their participation in the shooting. Hicks was subsequently arrested, at which time he gave two statements after waiving his rights. In his statements, defendant admitted he retrieved Messiah's gun from under the hood of Messiah's Ford Explorer while Messiah and the victim were arguing. However, defendant claimed he retrieved the gun in order to *197 hide it from Messiah. Defendant stated the gun was twisted from his hand before he had the opportunity to hide it. In his first statement, he alleged he did not see who took the gun. In his second statement, he admitted that Messiah took the gun.

ASSIGNMENT OF ERROR NUMBER ONE
Defendant contends the evidence was insufficient to convict him of manslaughter. In particular, defendant maintains he did not have the requisite intent to kill the victim. He maintains there was no evidence he voluntarily gave the gun to the shooter or that he even wanted the shooter to have the gun. He argues the shooter twisted his hand and then ripped the gun from it. Defendant further asserts his guilt cannot be based on his mere presence at the scene or association with the shooter.[3]
The standard for testing the sufficiency of the evidence requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).
Defendant was convicted of manslaughter, which is defined as the killing of a human being committed in "sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." LSA-R.S. 14:31(A)(1). It is undisputed that defendant was not the actual shooter. Therefore, the State had to prove defendant was a principal to manslaughter. A principal is defined as:
[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
LSA-R.S. 14:24. Only those persons who "knowingly participate in the planning or execution of a crime" are principals to that crime.[4] An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state.[5] The mental state of one defendant may not be imputed to another defendant.[6] Thus, mere presence at the scene of a crime does not make one a principal to the crime.[7] However, "it is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention."[8]
In the present case, the evidence shows defendant was present when the shooter, Messiah, and the victim began arguing.[9] *198 Defendant then left the room and retrieved a gun from Messiah's car. Although defendant claimed in his statement he intended to hide the gun from Messiah, there is evidence to the contrary. In particular, Cave and Nick both testified that defendant was attempting to go back up the stairs to the studio with the gun.
It is not the function of the appellate court to second-guess the credibility determinations of the trier of fact or to reweigh the evidence.[10] The jury chose not to believe defendant's version of events. Rather, the jury concluded that defendant willingly and knowingly provided Messiah with the weapon that Messiah used to kill the victim, a conclusion supported by the record. Defendant and Messiah were partners and friends. They had arrived at the recording studio together to write music. When Messiah and the victim began arguing, defendant left the room and retrieved a gun. In his statement, defendant suggested he knew Messiah would use the gun. From this evidence, a reasonable juror could conclude that defendant knowingly helped his friend kill the victim by providing the gun to Messiah.
In State v. Meyers,[11] this Court upheld the second degree murder conviction of a passenger who was in a car during a drive-by shooting. Defendant argued he did not have the requisite criminal intent as the actual shooter was another passenger in the car. This Court noted that the defendant did nothing to assist the victim after the shooting and did not call the police to report the shooting. This Court further noted that there was no direct evidence that defendant knew the shooter was armed. However, this Court suggested the jury reasonably inferred that all the occupants of the vehicle knew the purpose of confronting the victim, a drug dealer, on the street that night.
Likewise, in the present case, defendant did nothing to assist the victim after the shooting and did not call the police to report the shooting. Immediately after the shooting, defendant left the scene with Messiah. According to his own statement, even after Messiah admitted killing the victim, defendant did nothing, except ask to be let out of the car.
Defendant argues that he did not have the requisite intent to kill the victim and relies on State v. Pierre, 93-0893 (La.2/3/94), 631 So.2d 427. In Pierre, the defendant was convicted of manslaughter after having been charged and prosecuted as a principal to second degree murder under LSA-R.S. 14:30.1(1). The State conceded at trial that the defendant did not kill the victim, but argued that evidence placing him at the scene of the killing was indicative of his guilt as a principal. The Louisiana Supreme Court reversed defendant's conviction after concluding that defendant's presence at and near the crime scene was not sufficient to support his conviction as it did not demonstrate defendant had the requisite intent to kill the victim.
The present case is distinguishable from Pierre in that defendant's actions constituted more than just his mere presence at the crime scene. By his own statement, defendant knew what Messiah would do with a gun. Yet, defendant left the room where Messiah was in a heated argument with the victim, retrieved Messiah's gun from Messiah's vehicle, and attempted *199 to return to the studio where Messiah and the victim were arguing. Even though defendant maintained the gun was ripped from his hand and that he did not willingly give the gun to Messiah, the jury apparently rejected his contention. The conduct of leaving a heated argument, procuring a gun and returning to the scene reasonably supports the jury's conclusion that defendant had the requisite intent to kill the victim.

ASSIGNMENT OF ERROR NUMBER TWO AND THREE
Defendant argues his life sentence as a third felony offender is constitutionally excessive. He contends the evidence demonstrating his involvement in the underlying crime was speculative and only showed his involvement to be minimal. He further maintains both of his predicate offenses were neither serious nor violent. As such, defendant alleges his enhanced life sentence shocks the conscience.
Defendant acknowledges that a Motion to Reconsider Sentence was not filed as required by LSA-C.Cr.P. art. 881.1, but notes that trial counsel objected to the sentence as being excessive. Defendant maintains that the failure of his trial counsel to file a Motion to Reconsider does not preclude a review of his sentence for constitutional excessiveness. In the alternative, he asserts that if the excessiveness of his sentence is barred from review by the failure to file a Motion to Reconsider, then he received ineffective assistance of counsel.
Defendant is correct in asserting that his failure to file a Motion for Reconsideration of Sentence does not preclude review of his sentence for constitutional excessiveness.[12]State v. Hester, 99-426 (La.App. 5 Cir. 9/28/99), 746 So.2d 95, 103, writ denied in State v. Patterson, 99-3217 (La.4/20/00), 760 So.2d 342. Since defendant is only seeking a review of his sentence for constitutional excessiveness, his failure to move for reconsideration is inconsequential and, therefore, a claim for ineffective assistance of counsel claim has no merit.[13]
Defendant, age 25, was sentenced to life imprisonment without the benefit of parole, probation, or suspension of sentence after being adjudicated a third felony offender. Defendant's predicate convictions were for possession of stolen goods valued over $500.00 and possession of cocaine. Because defendant's underlying felony was a crime of violence, the multiple offender statute mandated a life sentence.[14] LSA-R.S. 15:529.1(A)(1)(b)(ii).
*200 Both the United States and Louisiana Constitutions prohibit the imposition of excessive or cruel punishment. U.S. Const. amend. VIII; La. Const. of 1974, art. I, § 20. A sentence is constitutionally excessive, even if it is within the statutory limits, if it is grossly disproportionate to the severity of the offense or is nothing more than the needless and purposeless imposition of pain and suffering.[15] If the trial judge finds that an enhanced punishment mandated by the Habitual Offender Law, LSA-R.S. 15:529.1, makes no "measurable contribution to acceptable goals of punishment" or that the sentence amounts to nothing more than "the purposeful imposition of pain and suffering" and is "grossly out of proportion to the severity of the crime," the court has the option and duty to reduce such sentence to one that would not be constitutionally excessive.[16]
It is presumed that a mandatory minimum sentence under the Habitual Offender Law is constitutional. State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672, 676. A court may only depart from the mandatory sentence if it finds clear and convincing evidence in the present case that would rebut the presumption of constitutionality. Id. The burden is on the defendant to rebut the presumption of constitutionality by showing:
[h]e is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.[17]
There must be substantial evidence to rebut the presumption of constitutionality. The "trial court may not depart from the legislatively mandated minimum simply because of some subjective impression or feeling about the defendant."[18] Additionally, a defendant's record of non-violent offenses cannot be the sole reason, or even the major reason, for declaring a mandatory minimum sentence excessive.[19] The Louisiana Supreme Court explained:
[t]his is because the defendant's history of violent or non-violent offenses has already been taken into account under the Habitual Offender Law for third and fourth offenders, which punishes third and fourth offenders with a history of violent offenses more severely than those with a history of non-violent offenses.[20]
The Louisiana Supreme Court has strongly emphasized that downward departures *201 from a mandatory minimum sentence should only occur in rare situations.[21]
As stated above, the mere fact defendant's predicate convictions were non-violent does not warrant a downward departure from the mandatory life sentence. In Lindsey, supra, defendant was convicted of simple robbery, which is classified as a crime of violence. However, his prior convictions consisted of non-violent crimes: attempted simple burglary, attempted burglary, and simple burglary. The Supreme Court stated the defendant was the exact type of offender the Habitual Offender Statute intends to punish so severely. The court stated:
[h]e is sentenced to life imprisonment because he continues to commit felony after felony. The fact his last felony was the only violent crime against a person is not an "unusual circumstance" that would support a downward departure. A person with three prior nonviolent felony convictions who then proceeds to commit a felony involving violence against a person has shown that his criminal conduct is becoming worse. The goals of the Habitual Offender Statute, to deter and punish recidivism, are satisfied by imposing a life sentence against such a person.
State v. Lindsey, supra at 344.
In the present case, defendant made no showing of exceptional circumstances to justify a downward departure from the mandatory minimum life sentence. In fact, no evidence was presented at the time of sentencing and no argument was made regarding a downward departure from the required minimum sentence. Defendant clearly failed to carry his burden under Johnson and, as such, we conclude defendant's life sentence is not excessive.[22] Additionally, as discussed in Lindsey, defendant, whose crimes have progressed from non-violent to violent, is the exact person for whom the mandatory life sentence is designed.

ERROR PATENT DISCUSSION
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The following matters are presented for review.
The trial court failed to advise defendant of the prescriptive period for post-conviction relief pursuant to LSA-C.Cr.P. art. 930.8 upon re-sentencing him as a third felony offender despite having properly advised him of the prescriptive period when sentencing him on the underlying offense.[23] The failure to inform defendant of the provisions of LSA-C.Cr.P. art. 930.8 does not constitute grounds for reversing the sentence or remanding the case for resentencing. LSA-C.Cr.P. art. 921. Rather, we instruct the trial court to inform the appellant of the two-year prescriptive period for post-conviction relief by sending written notice to *202 the appellant within ten days of the rendition of this opinion and to file written proof in the record that defendant received such notice.[24]
Accordingly, defendant, Lenard T. Hicks's, conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] This opinion will refer to individuals by their nicknames since that is how they are referenced throughout most of the trial transcript.
[2] An autopsy revealed the victim suffered two gunshot wounds, one fired at close range where the muzzle of the gun was in contact with his skin and one fired from an intermediate range, between 10-12 inches away, which was the lethal wound.
[3] The record does not show that defendant filed a Motion for Post Verdict Judgment of Acquittal pursuant to LSA-C.Cr.P. art. 821. However, such failure does not preclude appellate review of the sufficiency of the evidence. State v. Washington, 421 So.2d 887, 889 (La.1982).
[4] State v. Pierre, 93-0893 (La.2/3/94), 631 So.2d 427, 428.
[5] State v. Pierre, supra; State v. Cedrington, 98-253 (La.App. 5 Cir. 12/16/98), 725 So.2d 565, 573.
[6] State v. Cedrington, supra at 575.
[7] State v. Pierre, supra; State v. Cedrington, supra at 573.
[8] Cedrington, supra at 576 (quoting State v. Anderson, 97-1301 (La.2/6/98), 707 So.2d 1223, 1225).
[9] The record shows Messiah eluded arrest up until the time of defendant's trial. According to Detective Donald Clogher, Messiah was arrested in California during defendant's trial and was awaiting extradition to Louisiana.
[10] State v. Carter, 98-24 (La.App. 5 Cir. 5/27/98), 712 So.2d 701, writ denied, 98-1767 (La.11/6/98), 727 So.2d 444.
[11] 95-750 (La.App. 5 Cir. 11/26/96), 683 So.2d 1378, writ denied, 97-0234 (La.6/20/97), 695 So.2d 1350
[12] LSA-C.Cr.P. art. 881.1 requires that a motion for reconsideration of sentence be made orally at the time of sentencing, or in writing, and that it set forth the specific grounds on which the motion is based. The failure to state the specific grounds on which the motion is based precludes the defendant from raising issues relating to statutory errors or deficiencies in sentencing on appeal, not constitutional excessiveness. State v. Wickem, 99-1261 (La.App. 5 Cir. 4/12/00), 759 So.2d 961, 967, writ denied, 00-1371 (La.2/16/01), 785 So.2d 839.
[13] It is noted that the mere failure to file a motion to reconsider sentence does not in and of itself constitute ineffective assistance of counsel. A basis for ineffective assistance of counsel may only be found if a defendant can "show a reasonable probability that but for counsel's error, his sentence would have been different." State v. Pendelton, 96-367 (La. App. 5 Cir. 5/28/97), 696 So.2d 144, 159, writ denied, 97-1714 (La.12/19/97), 706 So.2d 450.
[14] In Act 403, effective June 15, 2001, the Legislature amended LSA-R.S. 15:529.1 to require a life sentence for a third felony offender only if the third felony and both of the predicate offenses were crimes of violence and/or drug offenses punishable by more than ten years. The Legislature expressly stated the amendment was to be applied prospectively. Defendant's underlying offense and the habitual offender proceeding and sentencing occurred prior to the amendment's effective date and, thus, the amendment is inapplicable to this case. See State v. Sugasti, 01-770 (La.App. 5 Cir. 11/27/01), 802 So.2d 943.
[15] State v. Wickem, 99-1261 (La.App. 5 Cir. 4/12/00), 759 So.2d 961, 968, writ denied, 00-1371 (La.2/16/01), 785 So.2d 839.
[16] State v. Dorthey, 623 So.2d 1276, 1280 (La.1993).
[17] State v. Johnson, supra at 676 (quoting State v. Young, 94-1636 (La.App. 4 Cir. 10/26/95), 663 So.2d 525, 528, writ denied, 95-3010 (La.3/22/96), 669 So.2d 1223).
[18] State v. Bell, 97-1134 (La.App. 5 Cir. 2/25/98), 709 So.2d 921, 927, writ denied, 98-0792 (La.9/16/98), 721 So.2d 477.
[19] State v. Johnson, 709 So.2d at 676.
[20] State v. Lindsey, 99-3256 c/w 99-3302 (La.10/17/00), 770 So.2d 339, 343, cert. denied, 532 U.S. 1010, 121 S.Ct. 1739, 149 L.Ed.2d 663 (2001).
[21] State v. Lindsey, supra; State v. Johnson, 709 So.2d at 677.
[22] See State v. Armstrong, 99-925 (La.App. 5 Cir. 2/16/00), 756 So.2d 533, writ denied, 00-2419 (La.6/1/01), 793 So.2d 182, and State v. Bell, 97-1134 (La.App. 5 Cir. 2/25/98), 709 So.2d 921, writ denied, 98-0792 (La.9/16/98), 721 So.2d 477, where this Court upheld defendants' life sentences on the basis defendants failed to offer evidence to rebut the presumption of constitutionality of their respective life sentences.
[23] The minute entry for defendant's enhanced sentence indicates that defendant was advised of the prescriptive period. (R., p. 116). However, the transcript is devoid of any such advisal. When there are discrepancies between the transcript and the minute entry, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983).
[24] State v. Cordero, 99-44 (La.App. 5 Cir. 6/1/99), 738 So.2d 84, 93, writs denied, 99-1877 and 99-1878 (La.11/24/99), 750 So.2d 981.