STATE OF LOUISIANA

VERSUS

GERALD LITTLE AKA "JUNIOR"

NO. 24-KA-82

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 22-1239, DIVISION "D"
HONORABLE JOSEPH A. MARINO, III, JUDGE PRESIDING

October 30, 2024

**TIMOTHY S. MARCEL**
**JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
John J. Molaison, Jr., and Timothy S. Marcel

**AFFIRMED;**
**REMANDED WITH INSTRUCTIONS**
    **TSM**
    **FHW**
    **JJM**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Naquin
Deputy, Clerk of Court

COUNSEL FOR DEFENDANT/APPELLANT,
GERALD LITTLE AKA JUNIOR
     Jane L. Beebe

DEFENDANT/APPELLANT,
GERALD LITTLE AKA JUNIOR
     In Proper Person

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
     Honorable Paul D. Connick, Jr.
     Thomas J. Butler
     Andrea F. Long
     Zachary L. Grate
     Alyssa Aleman

**MARCEL, J.**

Defendant, Gerald Little, was convicted of first-degree murder in violation of La. R.S. 14:30 and conspiracy to commit armed robbery in violation of La. R.S. 14:26:64. The trial court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence for first-degree murder, and to thirty-five years imprisonment at hard labor for conspiracy to commit armed robbery, with the sentences to run concurrently. For the following reasons, we affirm the convictions and sentences and remand with instructions to the trial court as set forth in our Errors Patent Review.

## PROCEDURAL HISTORY

On March 24, 2022, a Jefferson Parish Grand Jury returned a bill of indictment charging defendant, Gerald Little, with the first-degree murder of Jemond Cador in violation of La. R.S. 14:30 (count one) and conspiracy to commit armed robbery of Jemond Cador in violation of La. R.S. 14:26:64 (count four).[1] Defendant pled not guilty to both counts on March 28, 2022.

The case proceeded to trial, and on October 18, 2023, the jury unanimously found defendant guilty as charged on both counts. The trial court then sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on count one, and to thirty-five years imprisonment at hard labor for conspiracy to commit armed robbery on count four, with the sentences to run concurrently. A *Motion for Appeal and a Motion for Reconsideration of Sentence* were filed the following day. The trial court denied

---

[1] In the same indictment, as to count two, the State charged Kewane Keiunta Edwards a/k/a "Keke," Myron Lee, Isaiah White, and Matthew Smith with second-degree murder in violation of La. R.S. 14:30.1. As to count three, Myron Lee was charged alone for obstruction of justice in violation of La. R.S. 14:130.1. Kewane Keiunta Edwards a/k/a "Keke," Myron Lee, Isaiah White, and Matthew Kerry Smith were also charged with count four alongside defendant. The co-defendants were severed for trial.

defendant's motion for reconsideration of sentence and granted his motion for appeal. This timely appeal followed.

## FACTS

On the morning of December 6, 2021, defendant and four others, Myron Lee, Isaiah White, Kewane Edwards, and Matthew Smith, met in White's Baton Rouge apartment. Lee informed the group that he had been planning a robbery, which he referred to as a "lick", of a person he believed to have a large amount of money from drug dealing. The plan was to rob Jemond Cador, the victim, who lived in Terrytown, Louisiana, of marijuana and money. Lee brought two Glock pistols, a Model 17 and Model 23, with him to White's apartment. After finalizing their plan, the men dressed in black clothing and ski masks, loaded the two Glock pistols, and boarded Lee's black GMC Yukon. Along their way to Jefferson Parish, they stopped at Lee's home in Gonzales to retrieve an AR-15 rifle. Thereafter, the men continued towards the victim's apartment in Terrytown. During their drive, the five men continued to discuss details for the planned robbery. This included roles each would play: Edwards was to be the "bag man", Smith would carry the AR-15 rifle, and defendant and Lee would carry the Glock Model 23 and Glock Model 17 respectively. White was designated as the getaway driver. However, the plans changed when they reached Jefferson Parish; Smith took over as the getaway driver and White assumed the role of handling the AR-15 during the robbery.

Upon arrival at the victim's apartment complex in Terrytown, the five men initiated their plan. They drew down their ski masks and exited the vehicle. As the four men walked through the apartment complex, White and Edwards noticed a surveillance camera and backed away from defendant and Lee who were walking ahead towards the victim's residence.

2

At the door to Cador's apartment, Lee knocked and said "it's me" to the victim inside. Defendant was standing behind Lee. When the door opened, Lee fell into the apartment with the victim, and the two physically struggled over possession of Lee's Glock Model 17. Defendant remained in the doorway.

At defendant's trial, White testified that as Lee and the victim wrestled, the victim gained the physical advantage over Lee and started reaching for the gun. At that moment, defendant, while standing at the doorway, fired the first shot at the victim. White recalled that defendant then continued shooting. After the shooting stopped, White testified that the victim was laying on the ground. The four men then ran to the vehicle where Smith was waiting to drive them back to Baton Rouge.

While traveling west on I-10 toward to Baton Rouge, Louisiana State Trooper Ryan Zimmerman conducted a traffic stop of the Yukon. Trooper Zimmerman smelled marijuana and conducted a search of the vehicle, where he discovered two Glock handguns, an AR-15 rifle, a duffle bag containing a black sweatshirt and black jeans, and two ski masks in a console of the vehicle.

During the traffic stop, Trooper Zimmerman entered each weapon's serial number through NCIC. After confirming the weapons were not stolen, Trooper Zimmerman unloaded the Glock Model 17 and AR-15; the Glock Model 23 was found empty. All three weapons were returned to Lee. After a speeding citation was issued to the Smith, the men resumed traveling west on I-10. On their route to Baton Rouge, they stopped at Lee's house in Gonzales and dropped off the AR-15 and Glock Model 17.

Upon their arrival at White's Baton Rouge apartment, the men went inside and changed clothes. Lee took their discarded clothes and left. Defendant, Edwards, and Smith broke down the Glock Model 23 and soaked its parts in

3

bleach. White called his roommate, Jondell Smith, and reported the situation. On the following day, Jondell Smith arrived at the Baton Rouge apartment to pick up defendant, who took the Glock Model 23 with him.

Shortly after the shooting, Deputy Marvin Cephus Jr. of the Jefferson Parish Sheriff's Office (JPSO) responded to the scene at 294 Wright Avenue in Terrytown. Deputy Cephus was directed to Building 5, Apartment 236, where he observed the front door kicked in and found the victim lying on the ground, showing no signs of life, with blood coming from his body. After EMS confirmed the victim was deceased, responding officers notified crime scene, the homicide supervisor, and the coroner's office. Crime scene technicians arrived and documented a shotgun on the sofa, a bag of marijuana, shell casings, and a damaged doorframe in photographs. The homicide division then took over the investigation.

Detective Steven Quaintance was designated as lead homicide investigator on the case. He testified that upon his arrival at the apartment, he found the door had been forced-open and the victim was lying on the floor. While in the apartment, he found narcotics, seven .40 caliber cartridge casings, additional ballistic evidence, and a shotgun on the sofa.

In the course of their investigation, officers obtained a surveillance video recording from December 6, 2021, at 2:02 p.m. The recording depicted a black SUV entering the rear parking lot of the victim's apartment complex and four individuals exiting the vehicle. Two or three of them were armed and one carried a bag. The recording also captured the vehicle leaving at 2:04 p.m. Another surveillance video recording from a different camera angle showed the front of the complex on Wright Avenue and the stairwell leading to the victim's apartment. That video recording captured four individuals going up the stairs and later

4

descending before fleeing the complex. Detective Quaintance estimated the entire incident occurred within approximately sixty seconds.

Using the automated license plate reader system, law enforcement identified a black GMC Yukon with a broken right rear taillight near the homicide scene on December 6, 2021, both before and after the homicide occurred. Specifically, the vehicle was seen at Terry Parkway, approximately a three-minute drive from the homicide scene, at 2:00 p.m. It was later tracked traveling towards LaPlace via the Veterans Boulevard exit on LA 30 and then to Purpura Road.

Based on its license plate, "389 BHF", law enforcement determined the black GMC Yukon's registered owner to be Brook Mitchell of Jennings, Louisiana. Ms. Mitchell also had an address at 2019 South Woodlawn, Gonzales. This was an address also used by Lee and it matched the vehicle's movements on December 6, 2021. Using law enforcement databases, they obtained Lee's phone number. It was discovered that Lee's number was saved in the victim's phone under the name "Lee."

According to Detective Quaintance, the Gonzales Police Department conducted surveillance on the Gonzales residence and observed the black GMC Yukon with the broken right rear taillight parked in the driveway. When law enforcement appeared with a search warrant for the residence, Lee was present inside along with Ms. Mitchell and her partner Mr. Stepteaux. Detective Anthony Buttone oversaw the Gonzales residence search and reported locating "what should have been two Glock firearms." Specifically, he recounted the discovery of a Glock Model 23 and an empty Glock firearm holster case. A later ballistics analysis confirmed that the Glock Model 23 recovered in the Gonzales residence was not the weapon used in the homicide.

5

Lee was arrested on December 14, 2021. While in custody, he voluntarily gave a recorded statement to Detective Quaintance. Lee described the events of December 6, 2021, identified the individuals involved, and spoke of their encounter with the Louisiana State Police. While Lee provided White's full name, he knew the others only by their nicknames. Based on this information, an arrest warrant was issued for White.

In his trial testimony, Detective Quaintance explained that Mr. Stepteaux provided purchase receipts for firearms. Serial numbers for the rifle and two-tone Glock 17 provided by Mr. Stepteaux matched the weapons found inside the vehicle when it was stopped by Trooper Zimmerman after the homicide. A third weapon, a Glock Model 23, was missing from the residence.

Investigators obtained body camera and dash camera recordings of Trooper Zimmerman's December 6, 2021 traffic stop of the GMC Yukon. Recordings showed Trooper Zimmerman obtaining the occupants' full names and dates of birth, seizing two pistols and one rifle, and radioing in their serial numbers. The serial number of a pistol found by Trooper Zimmerman in the GMC Yukon matched the one taken from Mr. Stepteaux's Gonzales residence.

U.S. Marshals apprehended White along with co-defendants Smith and Edwards at White's Baton Rouge apartment on December 15, 2021. White, Edwards, and Smith provided statements to law enforcement following their arrest. In his re-interview with law enforcement, Lee reported finding only the two-toned Glock and the AR-15 rifle in the cargo area of the vehicle when they stopped at his house in Gonzales after the incident. He informed law enforcement that he removed those weapons from the GMC Yukon and placed them in a "junk vehicle" located on his parents' property. Based on this information, another search was

6

made at 2019 Woodlawn. The weapons described by Lee, along with a rifle magazine, were discovered inside the "junk vehicle" parked along the fence line.

Thereafter, a warrant was issued for defendant's arrest. He was apprehended on January 26, 2022 at 2024 Fourth Street in New Orleans. While in custody, defendant provided a recorded statement to Detective Quaintance.

While defendant did not testify at trial, his statement was admitted into evidence and was published to the jury. In that interview, defendant provided multiple versions of what happened on the day of the incident. Initially, defendant claimed he was not present at the homicide. He contended that he was at his aunt's house in New Orleans when the incident occurred. After Detective Quaintance advised him that Lee had implicated him and four others in the incident, defendant again denied being in Jefferson Parish that day. Defendant was presented with a photographic image from the victim's apartment complex on the date in question. Detective Quaintance informed defendant that White and Edwards identified him in the photograph. In response, defendant claimed the others had identified him because he was going to implicate them in an unrelated incident of child molestation in Covington.

Detective Quaintance then confronted defendant with the traffic stop by Trooper Zimmerman. In response, defendant acknowledged being inside the Yukon but claimed that he remained inside the vehicle the entire time they were at the victim's apartment complex. He maintained that he only learned of what had happened after hearing the gunshots.

Defendant would go on to recount events surrounding the robbery as the interview progressed. According to defendant, before leaving Baton Rouge, Lee told him they were going to "cop weed." He recalled they stopped in Gonzales to obtain a rifle and two handguns; Lee claimed the handguns belonged to his father

7

and the rifle was his own. He described one handgun as black, which was a Glock Model 17, and the other as "grayish-brown," which was a Glock Model 23. Once at the apartment complex, he stated Edwards exited the vehicle with a bag, Lee with a handgun, and White with a rifle.

Later in the interview, defendant ultimately admitted walking from the GMC Yukon to the victim's apartment. He described the events once they arrived at the victim's front door, recounting that Lee had his hand on the door, and when he kicked it open, the victim tried to close the door and keep him back. Defendant said once inside, Lee and the victim started "tussling," and that Lee had his Glock hanging. He described how the victim tried to grab the gun from Lee. When asked if it was self-defense, defendant said, "[i]t was not self-defense because he ran in this man's house[.]" He described Lee as creating a "home invasion" over twenty-five dollars' worth of marijuana.

Defendant stated that he believed Lee was in trouble, explaining he did not want to lose another "brother" and that he could not go through that again. He then described how the victim twisted and turned Lee so that the victim was over him. When he saw Lee pull the Glock and saw "him do that," he "did it." Defendant went on to describe that he remained in the doorway, saying "I didn't get to make it in." He said, "I admit to you that I did shoot him [indistinguishable] but that's not my gun. I did, I did."

Defendant then described scrambling down the stairs, getting into the vehicle, and being stopped by the police en route to Baton Rouge. He also confirmed they returned the clothes and guns to Lee.

**LAW and ANALYSIS**

On appeal, defendant raises one counseled assignment of error and four pro se assignments. In his counseled assignment, defendant argues that there was

8

24-KA-82

insufficient evidence presented at trial to support his conviction for first-degree murder.

In reviewing the sufficiency of the evidence, an appellate court must determine if the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Lane*, 20-181 (La. App. 5 Cir. 1/27/21), 310 So.3d 794, 80.

In making this determination, a reviewing court will not re-evaluate the credibility of witnesses or re-weigh the evidence. *State v. Woods*, 23-41 (La. App. 5 Cir. 11/15/23), 376 So.3d 1144, 1157, *writ denied*, 23-1615 (La. 05/29/24), 385 So.3d 700. Resolution of conflicting testimony rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *State v. Lavigne*, 22-282 (La. App. 5 Cir. 5/24/23), 365 So.3d 919, 940, *writ not considered*, 23-1119 (La. 10/10/23), 370 So.3d 1086. It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence. *State v. Mills*, 04-498 (La. App. 5 Cir. 03/29/05), 900 So.2d 953, 960, *writ denied*, 05-1470 (La. 01/13/06), 920 So.2d 235. Thus, in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. *State v. Sly*, 23-60 (La. App. 5 Cir. 11/2/23), 376 So.3d 1047, 1072, *writ denied*, 23-1588 (La. 4/23/24), 383 So.3d 608.

In this assignment of error, defendant only challenges his first-degree murder conviction. He contends the evidence was insufficient to convict him of first-degree murder when the evidence established the elements of manslaughter.

9

La. R.S. 14:30(1) defines first-degree murder, in pertinent part, as the killing of a human being "[w]hen the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of…armed robbery[.]" *State v. Lehmann*, 23-386 (La. App. 4 Cir. 2/5/24), 385 So.3d 268, 280. Thus, to convict defendant of first-degree murder, the State must have established the following essential elements beyond a reasonable doubt: (1) the defendant had the required specific intent to kill or inflict great bodily harm (2) while he was engaged in the perpetration or attempted perpetration of an armed robbery. *See State v. Higgins*, 03-1980 (La. 4/1/05), 898 So.2d 1219, 1227, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005); *State v. Bright*, 98-398 (La. 4/11/00), 776 So.2d 1134, 1141.

On appeal, defendant does not contest the sufficiency of the evidence as to the essential statutory elements with regard to his first-degree murder conviction. He does not deny that he shot and killed the victim. However, he argues his actions were justified because they were committed in self-defense or defense of others.

When self-defense or the defense of another is claimed by the defendant in a homicide case, the State has the burden to prove beyond a reasonable doubt that the defendant did not act in self-defense or in defense of another. *State v. Rainey*, 98-436 (La. App. 5 Cir. 11/25/98), 722 So.2d 1097, 1103, *writ denied*, 98-3219 (La. 5/7/99), 741 So.2d 28. A homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La. R.S. 14:20(A)(1). A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using deadly force and may stand his or her ground and meet force with force. La. R.S. 14:20(C). In addition, La. R.S. 14:22 provides that "[i]t is

10

justifiable to use force or violence or to kill in the defense of another person when it is reasonably apparent that the person attacked could have justifiably used such means himself, and when it is reasonably believed that such intervention is necessary to protect the other person."

It is well established that the aggressor or the person who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict. *State v. Leach*, 22-194 (La. App. 5 Cir. 12/28/22), 356 So.3d 531, 544. *See* La. R.S. 14:21. In addition, while there is no unqualified duty to retreat, the possibility of escape from an altercation is a recognized factor in determining whether the defendant had a reasonable belief that deadly force was necessary to avoid the danger. *State v. Martin*, 20-141 (La. App. 5 Cir. 4/28/21), 347 So.3d 1061, 1068, *writ denied*, 21-803 (La. 10/1/21), 324 So.3d 1054. Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary include the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. *Lavigne*, 365 So.3d at 941. The determination of a defendant's culpability rests on a two-fold test: 1) whether, given the facts presented, the defendant could reasonably have believed his life to be in imminent danger; and 2) whether deadly force was necessary to prevent the danger. *Id.* The jury is the ultimate fact-finder in determining whether the State negated self-defense beyond a reasonable doubt. *Sly*, 376 So.3d at 1074.

In this instant case, the jury heard testimony and evidence that established that defendant, while armed with a Glock Model 23, accompanied three accomplices to the victim's apartment as part of a planned robbery. They had

11

earlier retrieved weapons from Lee's residence. In a recorded statement, defendant admitted to intending to rob the victim. When two companions fell back after spotting a camera, defendant stood behind Lee as he knocked on and kicked in the door. During the struggle inside, as described by White, Lee and the victim fought over a Glock Model 17. The gun fell during their altercation, and the victim gained the advantage and started reaching for it. White explained that the victim was trying to get the gun away from Lee. At this point, defendant fired multiple shots at the victim, with White witnessing defendant aiming the gun at them while they were on the ground. After fleeing back to their vehicle, defendant contemplated killing Lee for fear he might tell the police. Additionally, White mentioned that after discovering the AR-15 was unloaded, defendant switched to the loaded Glock Model 23.

The victim's body was discovered near the apartment's front door with visible bleeding. He had sustained seven gunshot wounds, including two fatal shots to his head from .40 caliber bullets. Dr. Troxclair confirmed the shots were fired from a distance of two to three feet away. Defendant was identified as possessing a Glock Model 23 handgun, which was not recovered. Detective Buttone connected this firearm, owned by Lee's stepfather, to .40 caliber casings found at the crime scene. Live .40 caliber bullets found at Lee's residence matched those recovered. Trial evidence indicated defendant fired continuously until the gun was empty, and police found it unloaded during a subsequent traffic stop. The entire incident occurred within approximately sixty seconds near the apartment's entrance.

The jury evidently rejected defendant's theory of self-defense in reaching their verdict. Defendant claimed in his statement that he acted to protect Lee because he did not want to lose his "brother" again, but despite this, he later

12

contemplated killing Lee out of fear that Lee might inform the police. However, there was no evidence presented that the victim had any weapons, gained control of Lee's weapon, or threatened anyone present. During the altercation between the victim and Lee, defendant did not attempt to end the altercation or pull Lee out of the victim's reach or retreat. Instead, he began shooting the victim multiple times, including twice in the head, when he saw him reaching for Lee's weapon. After the shooting, defendant failed to report the shooting and fled from the scene. These actions were inconsistent with the theory of justifiable homicide. *See State v. Wallace*, 612 So.2d 183, 191 (La. App. 1 Cir. 1992), *writ denied*, 614 So.2d 1253 (La. 1993). Flight and evasion of apprehension are circumstances from which a trier of fact may infer a guilty conscience. *State v. Cazenave*, 00-183 (La. App. 5 Cir. 10/31/00), 772 So.2d 854, 860, *writ denied*, 00-3297 (La. 10/26/01), 799 So.2d 1151.

Furthermore, defendant's argument ignores his and his companions' actions that led the victim to attempt to grab Lee's weapon in the first place. He and his armed accomplices arrived at the victim's apartment on December 6, 2021, intending to rob him. In *State v. Scales*, 93-2003 (La. 5/22/95), 655 So.2d 1326, 1336, *cert. denied*, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996), the Louisiana Supreme Court found that because the defendant brought on the difficulty by engaging in an armed robbery at the time of the shooting, he could not claim the right of self-defense. Similarly, the second circuit found that regardless of conflicting testimony regarding who fired the first shot, because the defendant was engaged in an armed robbery at the time of the shooting, he was unquestionably the aggressor and had no right to claim self-defense. *State v. Hopkins,* 34,119 (La. App. 2 Cir. 12/20/00), 774 So.2d 1178, 1183. In this case, since the evidence indicates that defendant brought on a difficulty by engaging in

13

the attempted perpetration of an armed robbery at the time of the shooting, he cannot claim the right of self-defense. *See Scales, supra.* Therefore, we find the State met its burden of proving defendant did not act in self-defense.

Alternatively, defendant argues that if his actions are not deemed self-defense, he should have been convicted of manslaughter rather than first-degree murder arguing he acted out of sudden fear for his life and for Lee's life. The offense of manslaughter is defined as a homicide that would be first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31; *State v. Monterroso*, 22-390 (La. App. 5 Cir. 4/26/23), 361 So.3d 1177, 1190, *writ denied*, 23-745 (La. 11/21/23), 373 So.3d 447.

Sudden passion and heat of blood distinguish manslaughter from murder, but they are not elements of the offense. Instead, they are mitigating factors that may reduce the grade of the offense. *State v. Thompson*, 18-273 (La. App. 5 Cir. 11/28/18), 259 So.3d 1257, 1266, *writ denied*, 18-2077 (La. 9/6/19), 278 So.3d 372. In order to be entitled to the lesser verdict of manslaughter, the defendant is required to prove the mitigatory factors by a preponderance of the evidence. *State v. Burse*, 19-381 (La. App. 5 Cir. 2/12/20), 289 So.3d 690, 696, *writ denied*, 20-650 (La. 11/24/20), 305 So.3d 104. Provocation and time for cooling are questions for the jury to determine under the standard of the average or ordinary person, one with ordinary self-control. *Id*. The question for this Court on review is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. *Id*.

14

Defendant suggests that the shooting was "a reaction to fear and in the sudden heat of passion." We disagree. The mitigating factors for manslaughter were not established by a preponderance of the evidence in this case.

In *State v. Wright*, 42,956 (La. App. 2 Cir. 3/5/08), 978 So.2d 1062, *writ denied*, 08-819 (La. 10/31/08), 994 So.2d 532, the defendant and his accomplices, Foster and Hill, planned to rob the victim, believing he had drugs and money and could not report them. They forced their way into the victim's house, where they demanded money and drugs. Despite giving them $1,500, the victim was later taken in his car. During the drive, he tried to take the defendant's gun, causing a struggle that resulted in gunshot wounds to both the defendant and Foster. Afterward, the defendant and Foster returned to the victim's house, left in a truck, and sought medical help. The victim was later found dead with multiple gunshot wounds and blunt force trauma. *Id.* at 1066-67.

In *Wright*, the defendant argued on appeal that his conviction should be reduced to manslaughter because the shooting occurred in "sudden blood heat of passion" because the victim was fighting for the gun. *Id.* at 1069. The second circuit indicated that although the defendant was shot during the struggle with the victim, the actual shooter was his accomplice, Foster. Further, the court held, "When a victim is fighting back against two armed gunmen, actions of self-defense are not provocation to reduce a charge of second-degree murder to manslaughter." The court provided that the defendant fatally shot the victim during the perpetration of an aggravated burglary, armed robbery, and aggravated kidnaping. The court found that neither the fact that the victim acted in self-defense, nor the fact that the defendant was shot by his accomplice, constitutes provocation to reduce the charge of second degree murder to manslaughter. The court held that the defendant, therefore, did not meet his burden of proving that he killed the

24-KA-82

victim while acting in "sudden passion or heat of blood," and, thus, he was not entitled to a reduced verdict of manslaughter. *Id*. at 1072.

Similarly, in the instant case, the State's evidence reflects that after defendant's accomplice, Lee, kicked in the apartment door and began fighting with the victim, defendant aimed his gun at the victim and fired it seven times. The evidence shows that defendant was not being attacked prior to or at the time of the shootings or that the victim threatened him in any way. Defendant fatally shot the victim during the attempted perpetration of an armed robbery. The fact that the victim tried to defend himself does not constitute provocation to reduce the charge of first degree murder to manslaughter. *See Wright, supra*. Defendant failed to carry his burden of proof of sudden passion or heat of blood to reduce the offense to manslaughter.

Based on the evidence in this case, and viewing the evidence in the light most favorable to the State, we find that a rational trier of fact could have found that the evidence was sufficient under the *Jackson* standard to support the conviction of first-degree murder.

Defendant also raises four *pro se* assignments of error in his supplemental brief. In these assignments, the entirety of defendant's law and argument is as follows:

Appellant Gerald Little is a Prose [sic] Petitioner who is unskilled in law and objects to my appellate counsel Jane L. Bebe appeal brief on my behalf.

I maintain my innocence and I never confessed to any crime, I never told detectives I knew about the instant crime.

I never received any transcripts of my trial, everything is false that appellant counsel Jane L. Bebe [sic] says.

24-KA-82

I never talked to my trial lawyer prior to trial. I also object to my trial counsel opening statements, closing statements, and the entire defense of trial counsel.

Defendant's primary complaint is that he did not receive the trial record in this matter. Our review indicates that by letter dated March 27, 2024, defendant requested to view the record and to file a *pro se* supplemental brief. On April 9, 2024, this Court granted his request and ordered the record transmitted to defendant through the Legal Programs Department at Louisiana State Penitentiary. The order further provided that defendant had until May 9, 2024 to file a *pro se* supplemental brief in this appeal. Our review also revealed that the record was transmitted to the Louisiana State Penitentiary electronically on April 9, 2024. Receipt was confirmed the same day. Defendant's pro se supplemental brief (dated May 9, 2024) was filed on May 17, 2024.

In these assignments, defendant also contends that appellate counsel's brief is based on false and fraudulent facts, objects to the entire record, and objects to the findings of material facts as unsupported by the evidence. We disagree. We have conducted a full and complete review of this appeal and have found no basis for defendant's assertions. As to defendant's remaining assignments pertaining to innocence and his trial counsel's performance, he has failed to brief these issues and therefore, we find them abandoned under Uniform Rules-Courts of Appeal, Rule 2-12.4(B)(4).

## ERRORS PATENT

The record was reviewed for errors patent according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175

24-KA-82

(La. App. 5 Cir. 1990).  After reviewing the record, we find the following errors patent.

The sentencing transcript reflects that the judge failed to order that defendant's sentence on count four (conspiracy to commit armed robbery) is to be served without benefit of parole, probation, or suspension of sentence as mandated by La. R.S. 14:26 and La. R.S. 14:64.   Likewise, the sentencing minute entry and the UCO also reflect that the sentence on count four was imposed without these restrictions.  This aligns with the sentencing transcript. Under La. R.S. 15:301.1 and *State v. Williams*, 00-1725 (La. 11/28/01), 800 So.2d 790, a statute's requirement that a defendant be sentenced without the benefit of parole, probation, or suspension of sentence is self-activating.  While the trial court's failure to impose defendant's sentence without the benefit of parole, probation, or suspension of sentence requires no corrective action, we remand for correction of the minute entry and UCO and direct the Clerk of Court for the 24th Judicial District Court to transmit the original of the corrected UCO to the institution to which defendant has been sentenced and to the Department of Corrections' legal department. *See State v. Jones*, 22-527 (La. App. 5 Cir. 5/24/23), 366 So.3d 821, 837; *State v. Breaux*, 22-535 (La. App. 5 Cir. 4/26/23), 362 So.3d 1020, 1026. *See also State v. Bardell*, 17-274 (La. App. 5 Cir. 11/15/17), 232 So.3d 82, 89-90 (where this Court acknowledged that while the statutory restriction of benefits is self-activating, it nonetheless remanded for correction of the sentencing minute entry to reflect the correct restriction of benefits).

Additionally, the sentencing minute entry does not reflect that defendant's conviction of first degree murder is a crime of violence.  Per La. C.Cr.P. art. 890.3(C), first and second degree murder "shall always be designated by the court in the minutes as a crime of violence."  Therefore, we order the correction of the

18

24-KA-82

minute entry to designate the conviction as a crime of violence. *See State v. Le*, 22-468 (La. App. 5 Cir. 8/9/23), 370 So.3d 162, *writ denied*, 23-1230 (La. 2/6/24), 378 So.3d 752; *State v. Williams*, 20-428 (La. App. 5 Cir. 4/28/21), 347 So.3d 1023, 1030, *writ denied*, 21-717 (La. 10/1/21), 324 So.3d 1059; *Thompson*, 259 So.3d at 1273 (where this Court during its error patent review found that the minute entries did not reflect that the defendants' convictions were designated as crimes of violence. This Court, on remand, ordered the correction of the minute entries).

Additionally, the sentencing transcript does not reflect that defendant was advised of the prescriptive period to seek post-conviction relief pursuant to La. C.Cr.P. art. 930.8. The sentencing minute entry also does not indicate that defendant was advised of the time period for filing an application for post-conviction relief. It is well-settled that if a trial court fails to advise, or provides an incomplete advisal, pursuant to La. C.Cr.P. art. 930.8, the appellate court may correct this error by informing the defendant of the applicable prescriptive period for post-conviction relief by means of its opinion. *State v. Taylor*, 20-215 (La. App. 5 Cir. 4/28/21), 347 So.3d 1008. Accordingly, by way of this opinion, we advise defendant that no application for post-conviction relief, including applications that seek an out-of-time appeal, shall be considered if filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922. *See Taylor, supra*.

## DECREE

For the reasons stated above, we affirm defendant's convictions and sentences and remand with instructions as set forth herein.

<u>**AFFIRMED;**</u>
<u>**REMANDED WITH**</u>
<u>**INSTRUCTIONS**</u>

24-KA-82

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**OCTOBER 30, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 24-KA-82

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE JOSEPH A. MARINO, III (DISTRICT JUDGE)
HONORABLE GLENN B. ANSARDI (DISTRICT JUDGE)
JANE L. BEEBE (APPELLANT)          ANDREA F. LONG (APPELLEE)          THOMAS J. BUTLER (APPELLEE)

### MAILED
ALYSSA ALEMAN (APPELLEE)
ATTORNEYS AT LAW
200 DERBIGNY STREET
GRETNA, LA 70053

GERALD LITTLE #783274 (APPELLANT)
LOUISIANA STATE PENITENTIARY
ANGOLA, LA 70712

HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
ZACHARY L. GRATE (APPELLEE)
ASSISTANT DISTRICT ATTORNEYS
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053